IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| WILLIAM W. HINTALLA, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | No. 10 C 5152 |
| | ) | |
| v. | ) | Judge Ronald A. Guzmán |
| | ) | |
| SEALY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff alleges that defendant terminated him in violation of the Americans with Disabilities Act ("ADA") and the Age Discrimination in Employment Act ("ADEA"). The case is before the Court on defendant's Federal Rule of Civil Procedure ("Rule") 56(c) motion for summary judgment. For the reasons set forth below, the Court grants the motion.

## Facts

In 2000, defendant hired plaintiff, who was fifty-two years old, to be the manager of its Taylor, Michigan plant. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 3.) In early 2003, defendant closed the Taylor plant and gave plaintiff two options: (1) become the Regional Manufacturing Engineering Manager of its Batavia, Illinois plant; or (2) end his employment and receive severance pay. (*Id.* ¶¶ 4-6.) Plaintiff chose the former option and transferred to Batavia in early 2003. (*Id.* ¶ 6.)

In June 2006, William D'Amico became plaintiff's supervisor. (Def.'s Resp. Pl.'s Corrected LR 56.1(b)(3)(C) Stmt. ¶ 3.) Plaintiff met D'Amico about a month later, when the two performed an audit together in California. (*Id.*) Though D'Amico denies it, plaintiff says he told D'Amico,

shortly after they met, that he had no vision in his right eye. (Pl.'s Corrected LR 56.1(b)(3)(C) Stmt. ¶ 5.)

In November 2006, when he was updating D'Amico about an inspection, plaintiff remarked that the long days were taking a toll on him. (*Id.* ¶ 6.) D'Amico's response, according to plaintiff was: "You are just getting old." (*Id.*) A few days later, D'Amico asked plaintiff what year he had graduated from college and whether he would be fifty-nine or sixty on his next birthday. (*Id.* ¶ 7.)

On March 15, 2007, D'Amico gave plaintiff his 2006 performance appraisal and an overall rating of "improvement needed," the second lowest of the four available ratings. (*See* Pl.'s Ex. 1, Hintalla Decl., Ex. B, 2006 Performance Appraisal.) Among other things, D'Amico said plaintiff: (1) had not performed at a level commensurate with his experience; (2) had not "fill[ed] the . . . leadership void" that existed during the first six months of 2006, when D'Amico's position was vacant; (3) was "more comfortable receiving direction than taking the initiative" and had difficulty executing directions he received; and (4) was unlikely to have "future opportunity for upward mobility." (*Id.*) D'Amico set a series of goals for plaintiff and noted that "[h]is progress . . . will be monitored closely and a formal progress/re-evaluation will be conducted within six months." (*Id.*)

Forty-five days later, D'Amico assessed plaintiff's progress toward the goals set in his 2006 appraisal:

> Bill's 45 day process report is disappointing, He was given clear objectives on 15 March when receiving his performance appraisal and again on 20 March with a follow-up summary email . . . . Despite this clear guidance, little improvement has been demonstrated or observed. His lack of improvement, despite the guidance, brings into question his ability to perform at the current level.
>
> Based on Bill's past performance and lack of improvement since 15 March, I have little confidence that he can perform at the level commensurate with the position

assigned. He does not demonstrate the requisite Quality Assurance experience or leadership/resource management skill-set to perform at the level of a Regional Manufacturing Engineering Manager.

(Def.'s Ex. 2, 45 Day Progress Assessment.)

In July 2007, D'Amico again assessed plaintiff's progress and said:

After a close 90 day observation period, I have concluded that Bill does not possess the necessary tools or character traits to effectively perform in the position of Regional Manufacturing Engineering Manager. . . .

His lack of vision, inability to inspire and failure to raise the performance expectation levels of his subordinates is detrimental to overall effectiveness and performance of the Quality Assurance Group. I recommend that he be removed from this position.

(Def.'s Ex. 3, 90 Day Progress Assessment.)

Consequently, defendant told plaintiff he could either take a step down to the position of Quality Process Engineer ("QPE") in Batavia or end his employment and receive severance. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 17.) Plaintiff chose the former and, in July 2007, he moved into the QPE job in Batavia. (*Id.* ¶ 18.)

In March 2008, plaintiff's supervisor, Robert Mele, gave plaintiff his 2007 performance appraisal. (*See* Pl.'s Ex. 1, Hintalla Decl., Ex. B, 2007 Performance Appraisal.) Mele gave plaintiff an overall rating of "commendable," one level higher than the "improvement needed" plaintiff received from D'Amico the previous year. (*Id.*) However, Mele said:

Bill needs to work on a strong leadership style to command the respect and influence necessary to drive change in the Quality and Engineering Departments. He needs to be cognizant of opportunities to step in and lead a projects, activity or get closure to issues our Dept. is involved in.

Bills needs to demonstrate the conviction and vision to give management a high confidence in his ability and be seen as a results oriented leader and is [sic] preparing to take on larger leadership roles.

3

(*Id.*)

In early 2009, Mele gave plaintiff his 2008 performance appraisal. (*See id.*, 2008 Performance Appraisal.) The rating system had been changed from four descriptive ratings – "far exceeds," "commendable," "improvement needed" and "unsatisfactory" – to a six-level numerical rating system in which 6 was "exceptional" and 1 was "unsatisfactory." (*Id.*) Mele gave plaintiff an overall rating of 3.5 and said:

> Bill needs to demonstrate the resolve, speed and strategy to make purposeful change, give management the confidence in his ability, and be seen as a results oriented leader that is prepared to take on a larger role. He should continue to be cognizant of opportunities to step in and lead a project, activity or get closure to issues. . . . He needs to evaluate situations with more breadth and depth to identify and eliminate true root causes and implement more effective long-term solutions.

(*Id.*)

In 2009, Sealy engaged in a reduction in force ("RIF") in the engineering department, decreasing the number of QPEs from five to four. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 22; Def.'s Ex. 9, Cotton Decl. ¶ 4.) As part of the process, D'Amico reviewed the QPEs' most recent performance appraisals, which were for 2008. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 24-26.) The five QPEs received the following overall ratings: Carolyn Hinderman – 5, Edgar Valencia – 5, Stephen Wrublewski – 4.5, Ebru Selcuki – 4.25 and plaintiff - 3.5. (*See* Def.'s Ex. 8, D'Amico Decl., Exs. I-L, 2008 Appraisals of Hinderman, Selcuki, Wrublewski and Valencia; Def.'s Ex. 10, Hintalla Dep. 96-97 (identifying Deposition Exhibit 13 as his 2008 performance appraisal); Def.'s Ex. 11, Hintalla Dep. Ex. 13, 2008 Hintalla Performance Appraisal).) D'Amico then performed a weighted analysis of the appraisals, which yielded the following scores: Hinderman – 321, Edgar Valencia – 402, Stephen Wrublewski – 258, Selcuki – 330, and plaintiff – 231. (Def.'s Ex. M, Management

4

Weighting.) Thus, plaintiff had both the lowest overall rating for 2008 and the lowest weighted rating.

Thereafter, D'Amico, who was fifty-four, terminated plaintiff, who was sixty-one, effective September 15, 2009. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 30-31; Pl.'s Corrected LR 56.1(b)(3)(C) Stmt. ¶ 31.) At the time, the ages of the other QPEs were: Hinderman – 34, Selcuki – 36, Wrublewski – 51, and Valencia – 48. (Pl.'s Corrected LR 56.1(b)(3)(C) Stmt. ¶ 32.)

Effective December 1, 2009, Hinderman transferred to another position, leaving defendant with only three QPEs. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 33; *see* Pl.'s Ex. 4, Hinderman 2009 Performance Appraisal.) The record does not show when or to whom Hinderman applied for the transfer or when or by whom her request was approved. There is no dispute, however, that around the time of Hinderman's transfer, D'Amico and Cotton, who was then a Production Supervisor, discussed creating a Senior QPE position to address the workload issues facing the three remaining QPEs and quality issues at defendant's plants. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 33-35.) It is also undisputed that, on October 27, 2009, defendant put a job notice in a trade publication for a Senior QPE, which said there were "2 openings" and listed qualifications for both a Senior QPE and a QPE. (*See* Def.'s Ex. 8, D'Amico Decl., Ex. O, Job Notice.) It is not clear whether plaintiff or anyone else ever applied for these jobs. It is undisputed, however, that defendant did not actually create a Senior QPE position and has not hired a Senior QPE or a QPE since plaintiff was terminated. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 39-40.)

**Discussion**

To prevail on a summary judgment motion, "the movant [must] show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage, we do not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

**<u>Disability</u>**

Plaintiff can defeat defendant's motion on his ADA claim by using either the direct or indirect method of proof. *Bultemeyer v. Fort Wayne Cmty Schs.*, 100 F.3d 1281, 1283 (7th Cir. 1996). The former requires defendant to offer evidence "that can be interpreted as an acknowledgment of discriminatory intent by the defendant," such as suspicious timing or biased comments, defendant's "systematically better treatment" of similarly situated non-disabled employees or its replacement of plaintiff with a non-disabled person for incredible reasons. *See Rudin v. Lincoln Land Cmty Coll.*, 420 F.3d 712, 720-21 (7th Cir. 2005). The latter requires plaintiff to "show that he is disabled within the meaning of the ADA, that he is qualified to perform the essential functions of the job, either with or without a reasonable accommodation, and that he suffered from an adverse employment action because of his disability." *Nese v. Julian Nordic Const. Co.*, 405 F.3d 638, 641 (7th Cir. 2005).

Plaintiff's ADA claim fails under both methods. Viewed favorably to him, the record shows that between July 2006 and July 2007, plaintiff told D'Amico that he had lost vision in his right eye

6

and had two appointments with a retinal specialist. (Pl.'s Corrected LR 56.1(b)(3)(C) Stmt. ¶¶ 3, 4.) There is no evidence, however, that D'Amico made comments to or about plaintiff or anyone else that suggests he is biased against disabled people, gave systematically better treatment to employees without disabilities or replaced plaintiff with a non-disabled person. In fact, there is no evidence at all that suggests plaintiff's alleged disability had any bearing on defendant's decision to terminate him. Accordingly, the Court grants defendant's motion for summary judgment on plaintiff's ADA claim.

**Age**

Plaintiff also contends that his ADEA claim survives under both the direct and the indirect methods of proof. As direct evidence of age discrimination, plaintiff offers: (1) the comment and inquiries about plaintiff's age that D'Amico made in November 2006; (3) the "improvement needed" appraisal D'Amico gave plaintiff for 2006 and his subsequent demotion of plaintiff to QPE in July 2007; (4) irregularities in the copy of plaintiff's 2008 performance appraisal that D'Amico used to make the termination decision; and (5) the fact that the QPEs retained by defendant in 2009 were all ten or more years younger than plaintiff. (*Id.* ¶¶ 6-18, 22-27, 32.)

These facts, however, are insufficient to satisfy the direct method of proof because: (1) D'Amico's remarks and dissatisfaction with plaintiff's 2006 performance are too remote from the 2009 termination decision to be probative of his intent, s*ee Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) (stating that a remark can give rise to an inference of discrimination only if it is made by the decision maker around the time of and in relation to the contested action); (2) the record refutes plaintiff's contention that his 2008 performance appraisal is different in form

7

than those of the other QPEs (*see* Def.'s Ex. 10, Hintalla Dep. 96-97 (identifying deposition exhibit 13 as his 2008 performance appraisal); Def.'s Ex. 8, D'Amico Decl., Exs. I-L, 2008 Appraisals of Hinderman, Selcuki, Wrublewski and Valencia; Def.'s Ex. 11, Hintalla Dep. Ex. 13, 2008 Hintalla Performance Appraisal); and (3) the fact that plaintiff is older than the QPEs defendant retained does not, by itself, give rise to an inference of discrimination, *see Weihaupt v. American Medical Ass'n*, 874 F.2d 419, 430 (7th Cir. 1989) (stating that age difference alone fails to raise an inference of age discrimination").

That leaves the indirect method of proof, under which plaintiff must make a prima facie case of discrimination, defendant must offer a legitimate, nondiscriminatory reason for the termination and plaintiff must offer evidence that defendant's reason for the termination is a pretext for discrimination. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 659 (7th Cir. 2001); *see Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 541 (7th Cir. 2007) (stating that pretext is evidenced by "weaknesses, implausibilities, inconsistencies, or contradictions" in defendant's explanation that permit the inference that defendant "did not act for the asserted non-discriminatory reason[]"). Defendant concedes, for purposes of this motion, that plaintiff has made a prima facie case and says the reason for his termination was the RIF. (Def.'s Mem. Supp. Mot. Summ. J. 7.) Plaintiff asserts that the RIF was a pretext for age discrimination as evidenced by: (1) D'Amico's 2006 comments about plaintiff's age and performance and de facto demotion of plaintiff to QPE in July 2007; (2) anomalies in the reorganization procedure; (3) defendant's shifting explanations for the termination; and (4) D'Amico's knowledge, when he terminated plaintiff, that QPE Hinderman would soon transfer to another position.

8

First, as noted above, D'Amico's 2006 conduct is too remote from the 2009 termination decision to be probative of his intent. *See Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 576 (7th Cir. 2003) (holding that age-related comments made two years before the contested termination were stray workplace remarks, "rather than evidence of the thought process behind [the] termination [decision]," given the "temporal distance between the comments and the . . . decision").

Second, the record does not support plaintiff's contention that there were irregularities in the RIF process. Though plaintiff faults D'Amico for using 2008 appraisals to make the termination decision in 2009, he admits that those were "the [QPEs'] most recent appraisals." (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 24.) Plaintiff also asserts that D'Amico deviated from defendant's practice of using seniority as the basis for RIFs, a practice with which plaintiff became familiar when he was "a . . . plant manager." (*See* Pl.'s Ex. 1, Hintalla Decl. ¶ 18j.) There is no dispute, however, that plaintiff has not been a plant manager since 2003 and he offers no evidence to rebut defendant's testimony that it stopped using seniority as the basis for RIFs in 2005. (*See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 3-6; Def.'s Ex. 13, Dabiero Decl. ¶ 2.)

Third, contrary to plaintiff's assertion, there is no evidence that defendant's explanation for plaintiff's termination changed over time. *See Schuster*, 327 F.3d at 577 (stating that "[s]hifting and inconsistent explanations" can suggest pretext, "[b]ut the explanations must actually be shifting and inconsistent to permit [that] inference"). Rather, the record shows that defendant has consistently said it terminated plaintiff pursuant to a RIF. (*See* Pl.'s Ex. 1, Hintalla Decl. ¶ 18j ("When I was terminated, I asked D'Amico if there was anything I could or should have done to keep this from happening. D'Amico said that this was not performance based and was solely a reduction in force."); Pl.'s Corrected LR 56.1(b)(3)(C) Stmt. ¶ 31 (asserting that plaintiff's termination letter said

9

"his position was being eliminated to reduce infrastructure costs"); Def.'s Ex. 8, D'Amico Decl., Ex, N, Letter from Dabiero to Hintalla (Sept. 3, 2009) (stating that Hintalla was being terminated as part of defendant's "continuing effort to reduce current infrastructure costs" by "eliminat[ing] a number of positions throughout the organization").) Moreover, though plaintiff was chosen for the RIF because his performance ratings were lower than that of the other QPEs (*see* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 24-27), the record does not suggest that his performance was unsatisfactory or that he would have been terminated absent the RIF. (*See* Def.'s Ex. 12, Burns Decl., Ex. A, Hintalla Dep. Ex. 13, 2008 Performance Appraisal (showing that plaintiff was given an overall rating of 3.5 on a scale of 1-6 and was not put on a corrective action plan); Def.'s Ex. 14, Supplemental Decl. D'Amico ¶ 2 ("Although Mr. Hintalla had several performance issues, if not for the reduction in force, his employment would not have been terminated in September 2009.").)

The situation is different, however, for plaintiff's claim that D'Amico knew Hinderman would soon be leaving her QPE position. Given the size and scope of defendant's operations – it has twenty-five plants in North America and employs more than 4,200 people – and the undisputed facts that D'Amico and Cotton discussed creating a Senior QPE position, wrote up a job posting and had it posted in a trade publication within six weeks of plaintiff's termination, it is reasonable to infer that D'Amico knew about Hinderman's transfer when he terminated plaintiff. *See* http://ir.sealy.com/phoenix.zhtml?c=151044&p=irol-homeProfile&t=&id=&; (Def.'s Ex. 8, D'Amico Decl., Ex. O, Job Posting). That inference, coupled with the contents of the posting, defendant's failure to explain why it considered hiring two QPEs within weeks of an alleged RIF, and the age difference between plaintiff and the QPEs who were retained create a genuine issue of

material fact as to whether defendant terminated plaintiff because of his age. Accordingly, the Court denies defendant's motion for summary judgment on plaintiff's ADEA claim.

## Conclusion

For the reasons set forth above, the Court finds that: (1) there is no genuine issue of material fact as to the ADA claim plaintiff asserts against defendant and defendant is entitled to judgment as a matter of law on that claim; and (2) there is a genuine issue of material fact as to the ADEA claim plaintiff asserts against defendant. Thus, the Court grants defendant's motion for summary judgment [23] as to the ADA claim and denies it as to the ADEA claim. At the next status hearing, the Court will set dates for filing the final pretrial order and for trial on the ADEA claim, the sole remaining claim in this suit.

**SO ORDERED.**                                   **ENTERED: February 17, 2012**

*Ronald A. Guzman*

_____
**HON. RONALD A. GUZMAN**
**United States District Judge**